# In the United States Court of Federal Claims

No. 23-2136

(Filed Under Seal: August 12, 2024)

(Reissued for Publication: August 26, 2024)[1]

```
*************************************
BCG FEDERAL CORPORATION,          *
                                  *
            Plaintiff,            *
                                  *
      v.                          *
                                  *
THE UNITED STATES,                *
                                  *
            Defendant.            *
*************************************
```

*Jennifer S. Zucker*, Greenberg Traurig, LLP, Washington, DC, counsel for Plaintiff. With whom were *Jeffery M. Chiow*, *Christopher M. O'Brien*, and *Eleanor M. Ross*, of counsel.

*Joshua W. Moore*, U.S. Department of Justice, Civil Division, Washington, DC, counsel for Defendant. With whom were *Stephan Polsdofer*, Assistant General Counsel, U.S. General Services Administration, and *Jared Sammons*, Assistant General Counsel, U.S. General Services Administration, of counsel.

## OPINION AND ORDER

**Dietz, Judge.**

Plaintiff, BCG Federal Corporation ("BCG"), seeks an order declaring that the One Acquisition Solution for Integrated Services ("OASIS+") Multiple Award Schedule ("MAS") solicitation issued by the United States General Services Administration ("GSA"), Federal Acquisition Service ("FAS") is arbitrary, capricious, an abuse of discretion, and not in accordance with law. BCG asserts that GSA conducted inadequate market research and made an improper commerciality determination under the Federal Acquisition Streamlining Act ("FASA") and Federal Acquisition Regulation ("FAR"). BCG further asserts that GSA improperly required all offerors to submit indirect cost data in violation of FAR subpart 15.4. Before the Court is the government's motion to dismiss BCG's first amended complaint for lack of standing under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC") and for failure to state a claim under RCFC 12(b)(6). Also before the Court are the parties' cross-motions for judgment on the administrative record ("MJAR"). For the reasons

---

[1] This Opinion and Order was filed under seal on August 12, 2024, *see* [ECF 26], in accordance with the Protective Order entered on December 9, 2023, *see* [ECF 9]. The Court gave the parties an opportunity to identify any proposed redactions. [ECF 26] at 1 n.1. The parties filed a joint status report on August 23, 2024, stating that they "have conferred and have no proposed redactions to the Court's Opinion and Order." [ECF 28] at 1.

stated below, the government's motion to dismiss is **DENIED**, BCG's MJAR is **DENIED**, and the government's MJAR is **GRANTED**.

## I.    BACKGROUND

BCG is a Delaware corporation with its principal place of business in Washington, DC. Compl. [ECF 1] ¶ 1. "BCG is a non-traditional defense contractor," which "exclusively provides commercial-items services." *Id.* GSA is an agency of the United States government that provides acquisition services. *Id.* ¶ 2. On June 15, 2023, GSA issued Request for Proposal No. 47QRCA23R0006 ("the Solicitation") for the OASIS+ Multi-Agency Contract ("MAC"). AR 2329, 2340.[2] [3] The OASIS+ MAC is "a Government-wide, multiple award, Indefinite Delivery, Indefinite Quantity (IDIQ) acquisition program for services." AR 2340. It "is designed to address agencies' need for a full range of service requirements that integrate multiple service disciplines and ancillary services/products with the flexibility for commercial and non-commercial requirements, all contract types and pricing determined at the task order level to achieve a total solution." *Id.* The OASIS+ program consolidated many of the requirements of certain legacy contract vehicles, including the OASIS, Human Capital and Training Solutions ("HCaTS"), and Building Maintenance and Operations (BMO) contracts. AR 561-63. The scope of OASIS+ "could support approximately 40% of common contract services spend as well as some defense related spend." AR 667.

The OASIS+ family of services contracts includes the following six "Master Contracts" or contract vehicles: (1) unrestricted ("UR") contracts, (2) 100% small business set-aside contracts, (3) 100% women-owned small business set-aside contracts, (4) 100% 8(a) small business set-aside contracts, (5) 100% service-disabled veteran-owned small business set-aside contracts, and (6) 100% historically underutilized business zone set-aside contracts. AR 2340.[4] The "Master Contract is designed to be a total solution vehicle for services,[5] allowing commercial and non-commercial solutions at the task order level." AR 2341. It contemplates awards of fixed-price, cost-reimbursement, incentive, time-and-materials, and labor-hour task order contracts. AR 2342. "Each individual Master Contract contains shared terms and conditions and specific terms and conditions unique to the Contractor's socioeconomic status (e.g., 8(a) and Small Business) and Domains." AR 2340.

The contract scope is organized by "Domains." AR 2349. The Master Contract contains the following eight Domains: (1) Management and Advisory, (2) Technical and Engineering, (3)

---

[2] The Court cites to the Administrative Record filed by the government at [ECF 11-1] as "AR ___."

[3] The GSA amended the Solicitation five times; the last time was on September 21, 2023. *See* AR 2329.

[4] BCG's protest only concerns the UR pool of contracts. [ECF 1] at 1.

[5] A "[t]otal solution is defined as any combination of direct supplies and services, as well as ancillary supplies and services, that are integral and necessary to the service-based requirements within the scope of the Master Contract and task order award." AR 2341. "[A] total solution may include any combination of contract types and labor associated with Contiguous United States (CONUS) labor, Outside CONUS (OCONUS) labor, specialized labor, construction wage rate requirements, professional labor, service contract labor standards, covered labor, and other costs such as subcontracts, travel, supplies, materials, equipment, special test equipment, and special tooling." *Id.*

Research and Development, (4) Intelligence Services, (5) Enterprise Solutions, (6) Environmental Services, (7) Facilities, and (8) Logistics. AR 2351. "Domains" are "functional groupings of related services spanning multiple North American Industry Classification System (NAICS) codes." AR 2349. "Domains are designed to align order requirements to qualified industry partners." *Id*. Offerors submit offers in relation to their selected Domains. AR 2478. Each Domain has "a specific Qualifications Matrix and corresponding qualifying threshold to ensure the highest quality, best-in-class standards are representative of customer needs in that mission space." AR 2523. The offer must meet or exceed the Domain-specific qualification threshold to receive a Domain award. *Id*. Under this approach, "offers will be evaluated against an objective standard and threshold for each proposed Domain . . . and will not be evaluated against, or compared to, other offers." *Id*. (emphasis removed). The Solicitation states that the "basis for awards will be All Qualified Offerors with a Fair and Reasonable Price." *Id*. (emphasis removed). There is no limit on the number of IDIQ contract awards that will result from the Solicitation. *Id.*

GSA conceptualized the OASIS+ program in September 2020. AR 1. From the beginning, GSA planned to establish price at the order level, not at the IDIQ level. AR 18. To permit this strategy, GSA intended to use "Class Deviation CD-2020-14," which implemented the exception found in 41 U.S.C. § 3306(c)(3) that allows government agencies to bypass evaluating price for certain IDIQ contract awards. AR 88, 106, 484, 598-601, 802. This deviation permitted GSA to exclude consideration of cost and price when evaluating proposals for certain IDIQ multiple award contracts. AR 598, 802. However, following the United States Court of Federal Claims' April 28, 2023, decision in *SH Synergy, LLC v. United States*, 165 Fed Cl. 745 (2023), the GSA began requiring all offerors to submit cost/price information for evaluation at the IDIQ level.[6] AR 802; AR 2657.

The Solicitation provided that each offeror shall: (1) "complete and submit one copy of Attachment J.P-9, Cost/Price Template," AR 2514;[7] (2) propose direct labor rates,[8] in the form of "ceiling rates applicable to sole-source [Time and Materials/Labor Hour ('T&M/LH')] type task orders," *id.*; and (3) "provide a Basis of Estimate and any supporting documentation in a single document," AR 2518. Regarding indirect rates, the Solicitation provided:

> Offerors shall propose indirect rate percentages according to their most current [Defense Contract Audit Agency, Defense Contract Management Agency or cognizant federal agency approved forward pricing rate agreement ("FPRA"), forward pricing rate

---

[6] In *SH Synergy*, the court held, in relevant part, that GSA cannot choose to evaluate price at the task order level for an IDIQ solicitation and elect not to evaluate price at the IDIQ level when the IDIQ does not "feature" time and materials or labor-hour contract types, as required by 41 U.S.C. § 3306(c)(3). *See SH Synergy*, 165 Fed. Cl. at 782-84.

[7] "The Cost/Price Template consists of 16 years . . . the five year base and five year option periods . . . plus an option to extend services up to six months, and an additional five years" for task orders that extend beyond the base and option terms. AR 2514.

[8] "'Direct Labor Rates' are labor rates that are not burdened with indirect rates such as fringe benefits, overhead, general and administrative expenses, and/or profit." AR 2514.

> recommendation ("FPRR"), and/or Provisional Billing Rates], if available. . . . If an Offeror does not have . . . approved FPRAs, FPRRs, Provisional Billing Rates, or other approved rates, Offerors shall propose indirect rate percentages generated from their accounting system.

AR 2516. The Solicitation sought proposed labor rates for twenty labor categories within the eight Domains. AR 2515.[9] Regarding the reasonableness of an offeror's proposed rates, the Solicitation provided that "[i]n the event any of the Offeror's proposed rates cannot be determined reasonable, the proposal will be deemed to have a ceiling rate(s) that is not considered fair and reasonable and the proposal would not be eligible for award, regardless of technical score." AR 2533. Finally, the Solicitation provided that "[a]n offer may be considered non-compliant to the Solicitation and rejected if there is any missing or incomplete data on the Cost/Price Template in accordance with Attachment J.P-9, Cost/Price Template." AR 2534.

On August 28, 2023, BCG filed a pre-award protest with the United States Government Accountability Office ("GAO"). AR 2734. BCG submitted an amended protest on September 8, 2023. AR 3220. BCG alleged that GSA's "requirement that all offerors provide a breakdown of indirect costs is unduly restrictive, contravenes the long-standing policy of procuring commercial products and services to the maximum extent possible, violates numerous FAR provisions, and is otherwise unreasonable." AR 3237. On November 30, 2023,[10] GAO denied BCG's protest. AR 4610. GAO held "that due to the unique characteristics of this procurement, obtaining the cost breakdown information at issue here, as authorized by FAR [subsection] 15.404-1 is the only acceptable method that will provide the insight necessary for the agency to make the required price reasonableness determinations at the IDIQ level." AR 4615-16. GAO further held that the "FASA establishes a preference, not a mandate, for the acquisition of commercial items," and "that, in structuring the OASIS+ solicitation, the agency took affirmative action to accommodate commercial item contractors and to encourage their participation," AR 4618.

Unsatisfied with this outcome, BCG filed the instant protest on December 15, 2023. [ECF 1]. In Count I, BCG alleges that GSA violated FAR subpart 15.4 by requiring "other than certified cost and pricing data from all offerors." *Id.* ¶ 53. In Count II, BCG alleges that "GSA failed to comply with FASA, binding Federal Circuit precedent, and the FAR by requiring that commercial items contractors provide an indirect cost breakdown." *Id.* ¶ 74. In Count III, BCG alleges that GSA failed to conduct proper market research in violation of FASA and FAR. *Id.* ¶¶ 84, 85. Lastly, in Count IV, BCG alleges that "GSA has not conducted a commerciality determination that complies with FASA or the FAR." *Id.* ¶ 97. BCG contends "that GSA's actions are arbitrary, capricious, an abuse of discretion, or otherwise contrary to law." *Id.* ¶ 99. BCG seeks "an Order declaring that the OASIS+ Solicitation is improper, violates FAR 15.4,

---

[9] The twenty labor categories are: engineers; managers; management analysts; operations research analysts; business operations specialists; administrative services managers; general or operations managers; accountants or auditors; financial specialists; training and development specialists; executive secretaries or executive administrative assistants; logisticians; financial or investment analysts; training and development managers; other teachers and instructors; human resources specialist; maintenance and repair workers; environmental scientists and specialists, including health; social scientists and related workers; and public relations specialists. AR 3219.

[10] The decision is erroneously dated "November 30, *3023*." AR 4610 (emphasis added).

FASA, and binding Federal Circuit precedent; . . . an Order declaring that the Government's decisions regarding market research were arbitrary, capricious, an abuse of discretion, or not in accordance with law; . . . [and] an Order declaring that the Government's commerciality determination was arbitrary, capricious, an abuse of discretion, or not in accordance with law;" as well as attorneys' fees and costs. *Id.* at 21-22.[11] After the Court set a briefing schedule, BCG filed its MJAR on February 9, 2024. [ECF 13]. The government filed its motion to dismiss, or in the alternative, cross-MJAR and response to BCG's MJAR on March 8, 2024. [ECF 18]. The motions are fully briefed, [ECFs 19, 20], and the Court held oral argument on May 21, 2024.[12]

## II.     THE GOVERNMENT'S MOTION TO DISMISS

The government moves to dismiss BCG's complaint under RCFC 12(b)(1) for lack of jurisdiction, arguing that BCG does not have standing under Article III of the United States Constitution and that its claims are moot. The government also moves to dismiss the complaint under RCFC 12(b)(6) for failure to state a claim, arguing that BCG lacks statutory standing under the Tucker Act. The Court finds that BCG has standing under Article III, that its claims are not moot, and that it has statutory standing under the Tucker Act.

### A.     Article III Standing Under RCFC 12(b)(1)

The government argues that BCG's complaint should be dismissed under RCFC 12(b)(1) for lack of standing because BCG cannot demonstrate that it suffered an injury-in-fact as required by Article III. [ECF 18] at 24-25. The government argues that BCG's alleged injury—that it will not be able to compete for the award because it does not have the requested pricing information—is contradicted by the fact that BCG submitted a proposal to GSA with the requested information and GSA determined that its price proposal is fair and reasonable. *Id.* at 25. The government further argues that BCG's case should be dismissed as moot under RCFC 12(b)(1) "because GSA has already determined that BCG's pricing is fair and reasonable," *id.* at 26, and therefore, the "GSA will not decline to award the contract to BCG as a result of its decision to 'require other than cost and pricing data,'" *id.*

A motion to dismiss for lack of standing pursuant to RCFC 12(b)(1) questions whether the court has jurisdiction to adjudicate the merits of the underlying dispute. *Warth v. Seldin*, 422 U.S. 490, 498 (1975); RCFC 12(b)(1). "Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986). The Court of Federal Claims, "though an Article I court, applies the same standing requirements enforced by other federal courts created under Article III." *Starr Int'l Co., Inc. v. United States*, 856 F.3d 953, 964 (Fed. Cir. 2017) (internal quotation marks omitted) (citing *Anderson v. United States*, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003)). To satisfy the Article III

---

[11] All page numbers in the parties' briefings refer to the page numbers generated by the CM/ECF system.

[12] On May 24, 2024, the government noticed its intent to voluntarily stay any contract award under the OASIS+ program until July 31, 2024. Def.'s Notice of Voluntary Stay [ECF 22] at 1. On July 25, 2024, the government agreed to extend the voluntary stay to August 14, 2024. Order [ECF 25] at 1.

standing requirements, a plaintiff must establish "(1) an actual or imminent injury-in-fact that is concrete and particularized; (2) a causal connection between the injury and the conduct complained of; and (3) likely[ ] . . . redress[ability] by a favorable decision." *Id.* (internal quotation marks omitted) (citing *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560-61 (1992). The court determines a party's standing as of the time it filed suit. *Indus. for the Blind, Inc. v. United States*, 120 Fed. Cl. 132, 135 (2015) (citing *Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1308 (Fed. Cir. 2003)). "The party invoking federal jurisdiction bears the burden of establishing [the] elements [of standing]." *Lujan,* 504 U.S. at 561 (citing *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990)). A plaintiff's burden extends to "demonstrating that it has standing for each claim." *Owl Creek Asia I, L.P. v. United States*, 148 Fed. Cl. 614, 641 (2020), *aff'd sub nom. Fairholme Funds, Inc. v. United States*, 26 F.4th 1274 (Fed. Cir. 2022) (citing *Starr Int'l Co.*, 856 F.3d at 964). "To survive a motion to dismiss for lack of standing, a complaint must contain sufficient factual matter that would plausibly establish standing if accepted as true." *Crow Creek Sioux Tribe v. United States*, 900 F.3d 1350, 1355 (Fed. Cir. 2018) (internal quotation marks and brackets omitted) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If the court determines that a protestor lacks standing, then the court lacks jurisdiction and must dismiss the case. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006).

The court must also be cognizant of mootness, a jurisdictional issue that derives from the case or controversy requirement of Article III. *Tech. Innovation, Inc. v. United States*, 93 Fed. Cl. 276, 278 (2010) (citing *DeFunis v. Odegaard*, 416 U.S. 312, 316 (1974); *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1944) (citation omitted). A case should be dismissed as moot "[w]hen, during the course of litigation, it develops that the relief sought has been granted or that the questions originally in controversy between the parties are no longer at issue[.]" *Chapman L. Firm Co. v. Greenleaf Constr. Co., Inc.*, 490 F.3d 934, 939 (Fed. Cir. 2007).

The Court finds that BCG has standing under Article III to bring its protest and that its claims are not moot. Contrary to the government's arguments, BCG has sufficiently alleged an injury-in-fact, as well as the other Article III standing requirements. In its complaint, BCG alleges that it was injured by GSA's failure to conduct proper market research and make a proper commerciality determination as required by FASA and FAR. [ECF 1] ¶¶ 89, 98. As a result of this failure, BCG alleges that GSA improperly determined that the majority of task orders issued under the OASIS+ program would be cost-reimbursable, which resulted in the GSA imposing unduly burdensome requirements on commercial contractors. *Id*. ¶ 89. It further alleges that this failure thereby "precluded [BCG] from bidding on OASIS+ unless it accept[ed] non-commercial terms and conditions." *Id*. ¶ 98. BCG also alleges that it was injured by GSA's unlawful requirement that it produce indirect cost data in violation of FAR subpart 15.4. *See id.* ¶ 4 (stating that "Plaintiff suffered non-trivial competitive injury by the Government's decision to require other than cost and pricing data from commercial items contractors"); *id.* ¶¶ 53-61 (alleging violations of FAR subpart 15.4). BCG alleges that the burdens stemming from this unlawful requirement "unduly restrict[] competition by precluding commercial services contractors from bidding due to the imposition of new accounting requirements that are outside of normal business practices." *Id.* ¶ 76. These allegations are sufficient to establish an actual injury-in-fact under Article III.

BCG's allegations also establish the requisite causal connection between the injury and the government's conduct, and that a decision in favor of BCG would likely redress the injury. Had the government properly conducted market research as required by FASA and FAR, it may have determined that the OASIS+ program requirements could be met by commercial services, which would result in commercial contracts, thereby avoiding the use of non-commercial contract terms and conditions. Additionally, had the government not unlawfully required in the Solicitation that BCG produce indirect cost data, BCG would not have needed to adopt new accounting practices—practices otherwise not utilized in its normal business practices—to submit an offer compliant with the terms of the Solicitation. *See* [ECF 1] ¶¶ 74-76. Regarding redressability, if the Court ultimately determines that the government acted unlawfully by failing to satisfy the market research requirement and by improperly designating the OASIS+ contract non-commercial, BCG's injury would be redressed by the government's lawful satisfaction of the market research requirement resulting in a proper commerciality determination, possibly resulting in a different outcome. Further, if the Court determines that GSA unlawfully required BCG to produce indirect cost data, BCG's injury would be redressed by GSA's no longer requiring that BCG produce this information.

The Court does not agree that—as the government argues—just because BCG was able to produce indirect cost data and the government found BCG's price proposal to be fair and reasonable, its claims are moot. An agency's corrective action renders a bid protest moot if the "corrective action adequately addresse[s] the effects of the challenged action, and . . . [there is] no reasonable expectation that the action [will] recur." *Chapman L. Firm Co.*, 490 F.3d at 940; *see also Cnty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (holding that a case becomes moot when "(1) it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation" (internal quotation marks and citations omitted)). That the government rated BCG's price proposal favorably in this instance is irrelevant because such action neither ensures that the government will not require BCG to comply with the alleged unlawful requirements in future OASIS+ solicitations, nor eradicates the lasting effects of imposing the requirements on BCG—namely, ongoing maintenance of new accounting system requirements outside of its normal business practices.

## B.      Statutory Standing Under RCFC 12(b)(6)

The government also argues that BCG's complaint should be dismissed under RCFC 12(b)(6) for lack of statutory standing under the Tucker Act. [ECF 18] at 22, 26. Acknowledging that "BCG is an actual bidder for standing purposes," the government nevertheless contends that BCG is not an interested party "because it cannot demonstrate prejudice." *Id.* at 27. According to the government, BCG cannot demonstrate prejudice because BCG only challenges the solicitation's price proposal requirement, and the government has already determined BCG's price proposal to be fair and reasonable. *Id.*

Standing under the Tucker Act is not a jurisdictional issue. *CACI, Inc.-Fed. v. United States*, 67 F.4th 1145, 1151 (Fed. Cir. 2023); *accord B.H. Aircraft Co. Inc. v. United States*, 89 F.4th 1360, 1363 (Fed. Cir. 2024). Therefore, a motion to dismiss for lack of standing under the

Tucker Act is considered under RCFC 12(b)(6). When a defendant moves to dismiss a complaint for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6), the Court must inquire whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In other words, the Court must assess whether "a claim has been stated adequately, [and whether] it may be supported by [a] showing [of] any sets of facts consistent with the allegations in the complaint." *Id.* at 563 (citation omitted). The plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Further, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference[.]" *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). Finally, as when deciding an RCFC 12(b)(1) motion, when the court considers an RCFC 12(b)(6) motion, it construes the complaint's allegations in favor of the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 814-15 (1982).

Under the Tucker Act, this Court has jurisdiction over actions "by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1). To demonstrate statutory standing under the Tucker Act, a party must demonstrate that it is an interested party and that it was prejudiced. *REV, LLC v. United States, Aptive Res., LLC*, 91 F.4th 1156, 1163 (Fed. Cir. 2024). An "interested party" under the Tucker Act is an "actual or prospective bidder[] or offeror[] whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Rex Serv. Corp. v. United States,* 448 F.3d 1305, 1307 (Fed. Cir. 2006) (internal quotation marks and emphasis omitted). "[T]o prove the existence of a direct economic interest, a [post-award protestor] must show that it had a 'substantial chance' of winning the contract." *Orion Tech., Inc. v. United States,* 704 F.3d 1344, 1348 (Fed. Cir. 2013) (quoting *Rex Serv. Corp.,* 448 F.3d at 1308). In the context of pre-award protests, a protestor may demonstrate direct economic interest by showing a "non-trivial competitive injury which can be addressed by judicial relief." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1361-62 (Fed. Cir. 2009) (citation omitted). Next, "the plaintiff must show that it was prejudiced by a significant error in the procurement process." *CliniComp Int'l, Inc. v. United States,* 904 F.3d 1353, 1358 (Fed. Cir. 2018). "Although the inquiries may be similar, prejudice must be shown either as part of, or in addition to, showing a direct economic interest." *Id.* "In assessing whether a party was prejudiced by purported errors in a procurement process, we must assume that the party will, if permitted to proceed with its claim, prevail on the merits." *REV, LLC*, 91 F.4th at 1164.

The Court finds that BCG has plausibly alleged that it is an interested party and that it is prejudiced by GSA's procurement violations. BCG is a provider of services to commercial and public sector clients. [ECF 1] ¶ 1. The government does not dispute that BCG is seeking a contract to perform services under the Solicitation. In its complaint, BCG alleges that it was prejudiced by GSA's failure to satisfy the market research requirements and make a proper commerciality determination as required under FASA and FAR, *id.* ¶¶ 89, 98, and that because

of this failure, the GSA imposed "unduly burdensome" pricing requirements on BCG, *see id*. ¶¶ 86-87, 89, and BCG is "precluded from bidding on OASIS+ unless it accepts non-commercial terms and conditions," *id*. ¶ 98. BCG also alleges that it was prejudiced by GSA's unlawful requirement that it produce "other than cost and pricing data" in violation of FAR subpart 15.4, *id*. ¶¶ 4, 53-61, and that because of this unlawful requirement, BCG is precluded from bidding on the Solicitation unless it adopts "new accounting requirements that are outside of [its] normal business practices," *id*. ¶ 76. Based on these allegations, assuming BCG prevails on the merits, BCG has sufficiently demonstrated that it has suffered a non-trivial competitive injury and that it has been prejudiced by GSA's unlawful procurement actions.[13]

The Court is not persuaded by the government's argument that BCG "cannot demonstrate prejudice" because BCG already submitted an offer and GSA found its price to be fair and reasonable. [ECF 18] at 27. That BCG submitted an offer that met the Solicitation's requirements and that GSA found BCG's price to be fair and reasonable does not preclude BCG from establishing standing to challenge the Solicitation's requirements as unlawful. BCG remains prejudiced by GSA's allegedly unlawful procurement actions because the only way BCG can participate in the OASIS+ program is if it accepts allegedly unlawful non-commercial contract terms and conditions and complies with the allegedly unlawful requirement to provide indirect cost data. BCG's ability to comply with the allegedly unlawful requirements of the OASIS+ program does not make the requirements lawful, or otherwise mitigate their effect on BCG.

## III.   THE PARTIES' CROSS-MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

BCG contends that "OASIS+ is an acquisition of commercial item services, which should have been confirmed by market research[,] but GSA erroneously focused on type of task orders to be used and not type of services." [ECF 13] at 23. It posits that "[i]f market research and the commercial item determination had been done properly, it would have been obvious that the Agency's pricing strategy with respect to the commercial item work was improper." *Id.* BCG argues that GSA's failure to conduct adequate market research and make a proper commerciality determination violates FASA and FAR, *id.* at 27-32, and that GSA's "demand [for] other than certified cost and pricing data—in the form of indirect cost breakdowns—from all offerors," *id.* at 38, breaks from the requirements of FAR subpart 15.4, *id.* at 37-45. The government counters that GSA conducted adequate market research and made a rational commerciality determination in compliance with FASA and FAR, [ECF 18] at 35-38, and that GSA acted within its discretion under FAR subpart 15.4 when it requested indirect cost data, *id.* at 39-46. The Court finds that (i) GSA's market research and commerciality determination were rational and did not violate FASA or FAR and (ii) GSA did not violate FAR subpart 15.4 by requiring all OASIS+ program offerors to submit indirect cost data.

---

[13] The government argues that the pre-award bid protest standard of establishing a direct economic interest, which requires the protestor to show a "non-trivial competitive injury which can be redressed by judicial relief," should not apply because BCG has already submitted its offer. [ECF 18] at 26. Because BCG has already submitted its offer, the government argues that the traditional "substantial chance" standard should apply since there is an "adequate factual predicate" upon which to ascertain whether BCG was prejudiced by GSA's actions. *Id.* The Court applies the pre-award standard because BCG filed its protest challenging the Solicitation's terms prior to submitting its offer. Furthermore, while GSA determined that BCG's price proposal was fair and reasonable during the pendency of this protest, it has voluntarily stayed the award of any contracts until August 14, 2024. [ECF 25].

Under RCFC 52.1, a party may file an MJAR to assess whether a federal administrative body acted in accordance "with the legal standards governing the decision under review." *Agile Def., Inc. v. United States*, 143 Fed. Cl. 10, 17 (2019). This motion "is often an appropriate vehicle to scrutinize an agency's procurement actions because such cases typically involve interpretation of contract documents or regulations, thereby presenting no disputed issues of material fact." *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1352 (Fed. Cir. 2004) (citation omitted). On such a motion, the parties are limited to the administrative record, and the court makes factual findings as if it were conducting a trial on the record. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1357 (Fed. Cir. 2005). The court's inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A&D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006) (citing *Bannum*, 404 F.3d at 1356).

Under the Tucker Act, the court reviews agency decisions in bid protests using the standard of review set forth in the Administrative Procedure Act ("APA"). 28 U.S.C. § 1491(b)(4) (citing 5 U.S.C. § 706); *see also Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (holding that 28 U.S.C. § 1491(b) applies the APA standard of review). This standard permits the court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Bannum, Inc.*, 404 F.3d at 1351 (stating that under the APA standard of review, "the trial court determines whether the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract"). "Under an arbitrary or capricious standard, the reviewing court should not substitute its judgment for that of the agency, but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts." *Glenn Def. Marine (Asia), PTE Ltd. v. United States*, 105 Fed. Cl. 541, 559 (2012) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). While the APA standard calls for considerable deference to the agency, *Advanced Data Concepts, Inc. v. United State*s, 216 F.3d 1054, 1058 (Fed. Cir. 2000), "a bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure," *Impresa*, 238 F.3d at 1332; *see also Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1343 (Fed. Cir. 2021) (stating that although "procurement decisions are subject to a highly deferential rational basis review . . . the court must sustain an agency action unless the action does not evince rational reasoning and consideration of relevant factors") (cleaned up) (citations omitted). If, however, the reviewing court finds that the agency's action evinced "rational reasoning and consideration of relevant factors," it must sustain it. *Advanced Data Concepts,* 216 F.3d at 1058 (citing *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)). Lastly, the APA standard provides that "the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706. In the context of a pre-award protest, this means that a "protestor must demonstrate 'a greater-than-insignificant chance' that correcting the agency's errors [in the procurement process] could lead to a different result for the protestor." *SH Synergy*, 165 Fed. Cl. at 758 (quoting *Am. Relocation Connections, L.L.C. v. United States*, 789 F. App'x 221, 228 (Fed. Cir. 2019)).

**A.      GSA's Market Research and Commerciality Determination Were Rational and Did Not Violate FASA or FAR**

According to BCG, while GSA's market research contains a list of products and services that GSA seeks to procure through the OASIS+ program, GSA failed to consider "whether its needs can be met through commercial products and services," as required by FASA and FAR 10.002. [ECF 13] at 33; [ECF 19] at 28. BCG contends that "FASA and [] FAR require that agencies first consider whether a need can be met by commercial products or services, or if a commercial product or service could be modified to satisfy the need, before selecting a vehicle to procure the product or service." [ECF 13] at 31. BCG further states that GSA's "commerciality determination is based exclusively on the estimate that, because 63% of OASIS historical spend was cost-reimbursement in nature, OASIS+ is expected to have at least as much, if not more, cost-reimbursement spend." *Id.* at 30. In BCG's view, "[s]imply because the Agency anticipates some cost-reimbursement task orders does not transform the nature of the work being performed," *id.*, and "[d]etermining a contract vehicle before identifying the need is illogical and contrary to numerous federal procurement laws," *id.* at 31.

*1.      Overview of FASA and FAR Part 10*

FASA provides, among other things, that executive agency heads "shall ensure that, to the maximum extent practicable," agency requirements "with respect to a procurement of supplies or services are stated in terms of--(A) functions to be performed; (B) performance required; or (C) essential physical characteristics." 41 U.S.C. § 3307(b)(1)(A)-(C). "FASA achieves its preference for commercial items in part through preliminary market research" to determine the availability of commercial items. *Palantir USG, Inc. v. United States*, 904 F.3d 980, 984 (Fed. Cir. 2018). It instructs that the agency head "shall conduct market research appropriate to the circumstances--(A) before developing new specifications for a procurement by that executive agency; and (B) before soliciting bids or proposals for a contract in excess of the simplified acquisition threshold." 41 U.S.C. § 3307(d)(1)(A)-(B). "[T]he results of market research" shall be used "to determine whether commercial services or commercial products . . . are available that" meet the agency's requirements, could be modified to do so, or could do so if the requirements themselves "were modified to a reasonable extent." *Id.* § 3307(d)(2)(A)-(C). The agency head is required to "document the results of market research in a manner appropriate to the size and complexity of the acquisition." *Id.* § 3307(d)(4).

FAR part 10, which implements the requirements of 41 U.S.C. § 3307, "prescribes policies and procedures for conducting market research to arrive at the most suitable approach to acquiring, distributing, and supporting supplies and services." FAR 10.000.[14] Consistent with FASA, it provides that agencies "shall" conduct market research. FAR 10.001(a)(2). It states that "[a]cquisitions begin with a description of the Government's needs stated in terms sufficient to allow conduct of market research." FAR 10.002(a). Further, it states that "[m]arket research is then conducted to determine if commercial products, commercial services, or nondevelopmental items are available to meet the Government's needs or could be modified to meet the

_____

[14] All citations to the FAR refer to the regulations at the time of the Solicitation.

Government's needs." FAR 10.002(b). "The extent of market research will vary, depending on such factors as urgency, estimated dollar value, complexity, and past experience." FAR 10.002(b)(1). "Market research involves obtaining information specific to the product or service being acquired." *Id.* Additionally, FAR part 10 sets forth what market research "should include," FAR 10.002(b)(1)(i)-(vii), and the techniques that "may" be used for conducting it, FAR 10.002(b)(2)(i)-(ix). If market research demonstrates that "commercial products, commercial services, or nondevelopmental items might not be available to satisfy the agency needs," it requires that the agency "reevaluate the need . . . and determine whether the need can be restated to permit commercial products, commercial services, or nondevelopmental items to satisfy the agency's needs." FAR 10.002(c). If market research demonstrates "that the Government's need may be met by a type of product or service customarily available in the commercial marketplace that would meet the definition of a commercial product or commercial service under [FAR] subpart 2.1, the contracting officer [("CO")] shall solicit and award any resultant contract using the policies and procedures in [FAR] part 12." FAR 10.002(d)(1). Alternatively, if the market research demonstrates that the commercial marketplace cannot meet the government's need, FAR part 12 "shall not be used." FAR 10.002(d)(2). Like FASA, FAR part 10 also provides that "[t]he head of the agency shall document the results of market research in a manner appropriate to the size and complexity of the acquisition." FAR 10.002(e).

>        2.    *Analysis*

GSA's market research and commerciality determination were rational and did not violate FASA or FAR part 10. First, GSA began its acquisition by describing its needs in a manner that allowed it to conduct market research, consistent with 41 U.S.C. § 3307(b)(1) and FAR 10.002(a). From the outset, GSA defined its need for "a single GSA Services Marketplace," AR 3, that covered all commonly procured services, AR 6, 18. The categories of services included facilities and construction, professional, information technology, medical, human capital, transportation and logistics, industrial, travel, security and protection, and office management. AR 6. In support of this expansive marketplace for acquisition of services, GSA sought to develop a single IDIQ contract vehicle that encompassed commercial and non-commercial services and allowed for the use of various order types, including fixed price, time and materials, cost type, and hybrid. AR 16, 50.

After identifying its needs, GSA conducted market research "appropriate to the circumstances." 41 U.S.C. § 3307(d)(1); *see* FAR 10.002(b)(1). GSA conducted industry surveys, industry days, outreach to professional groups, and market analysis, and developed iterative draft solicitations incorporating industry feedback and considered lessons learned from existing IDIQs. *See* AR 53, 663-724 (market research report summarizing market research activities). Its market research also analyzed agency spend data on the types of services "that could best be acquired through" a single IDIQ contract vehicle. AR 666-67. The results of the market research demonstrated that there are several "contract programs that support complex non-information technology (IT) services requirements" but that "there is no single [best-in-class multiple award contract] for services in government[.]" AR 666. After analyzing "those services needs that are currently met and unmet" by existing contract vehicles, GSA determined that "a more comprehensive services MAC program to support the acquisition of complex services represents a continuing need in the Government marketplace." *Id.*

GSA then used the results of its market research to determine whether commercial services were available to meet its needs, consistent with 41 U.S.C. § 3307(d)(2) and FAR 10.002(b)(1)(i). The GSA CO acknowledged that "OASIS+ allows for both commercial and non-commercial services at the task order level." AR 744. The CO then considered whether the OASIS+ IDIQ contracts could be restated to permit an entirely commercial contract, as required by FAR 10.002(c). *See* AR 742-44. Based on her analysis, the CO "determined the OASIS+ Master Contracts are considered noncommercial Multiple Award, Multi-Agency IDIQs due to the scope of the contracts being inclusive of all contract types (i.e., cost reimbursement, T&M, FFP), and inclusive of noncommercial and commercial services." AR 744. To accommodate this broad scope, the CO explained that use of a non-commercial contract vehicle was necessary to allow for the issuance of commercial task orders, as well as non-commercial, cost-reimbursement task orders. *See id.* The CO further explained that the "OASIS+ Master Contracts cannot be identified as commercial, purely for the acquisition of commercial items and services, as we could not allow the issuance of cost type task orders under the Master Contracts." AR 743. In this regard, the CO concluded that "[t]he historical data reviewed, especially the spend/task order data from the original OASIS contracts, firmly necessitates the allowance for cost-reimbursement contract types to be within the scope of the new OASIS+ contracts." AR 742. Because the market research showed that GSA's needs cannot be met by commercial services alone, the CO determined that a FAR part 12 procurement—which is used for commercial acquisitions—cannot be used.[15] *See* AR 743. The Court finds GSA's market research and commerciality determination rational and compliant with FASA and FAR part 10. It will not, therefore, second-guess the GSA's decision-making procedures. *Analytical Graphics, Inc. v. United States*, 135 Fed. Cl. 378, 429 (2019) (stating that the court will not second guess the agency's process when determining how the agency could best meet its requirements because this determination is within the broad discretion of agency officials) (citing *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1284 (Fed. Cir. 2010)).

BCG argues that GSA's "commerciality determination falls well short of reasonable," [ECF 13] at 30, because "it does not even consider the products and services that will be ordered under OASIS+," *id.* at 31. BCG states that "FASA and [] FAR require that agencies first consider whether a need can be met by commercial products or services, or if a commercial product or service could be modified to satisfy the need, before selecting a vehicle to procure the product or service." *Id.* BCG contends that, "[a]lthough the Agency's market research contains a listing of product[s] and services it seeks to obtain through OASIS+, [] there is no consideration of whether these needs can be met through commercial products and services." *Id.* at 33. BCG's reading of FASA and FAR part 10 are overly narrow. There is nothing in FASA or FAR part 10 that prohibits an agency from identifying, as part of its need, a contract vehicle that will allow for the procurement of commercial and non-commercial services.[16] While FASA and FAR require

---

[15] GSA's determination that the OASIS+ IDIQ is non-commercial does not allow agencies that utilize the IDIQ to evade market research requirements. FAR 10.001(a)(2)(v) provides that agencies must conduct market research appropriate to the circumstances "[b]efore awarding a task or delivery order under an [IDIQ] contract . . . for other than a commercial product or commercial service in excess of the simplified acquisition threshold[.]"

[16] In addition to FAR 10.002(a)-(b), BCG also cites to FAR 7.102(a) and FAR 11.002(a) to support its argument. Neither of these clauses prohibit an agency from identifying a contract vehicle as part of its need. *See* FAR 7.102(a) and FAR 11.002(a).

that the agency define its needs for supplies or services based on the type of supplies or services to be procured, this requirement applies "to the maximum extent practicable." *See* 41 U.S.C. § 3307(b)(1) (requiring that, to the maximum extent practicable, the agency state its requirements for supplies or services in terms of functions to be performed); FAR 11.002(a)(2) (same). Here, GSA considered the types of services by category and the anticipated contract spend under each category. AR 667-68. While this may amount to a list of services that GSA seeks to procure, it is sufficient for the purposes of FASA and FAR because the Solicitation is for the award of an IDIQ contract vehicle, not a specific project or task order. In this context, it is not practicable for GSA to further define its needs.

Furthermore, there is nothing in FASA or FAR part 10 that precludes the agency from relying on its past experiences under prior contract vehicles, including spend data by contract type, to determine whether its needs may be met by commercial services. To the contrary, both FASA and FAR part 10 afford discretion to the agency on how to conduct market research. FASA provides that the agency "shall conduct market research *appropriate to the circumstances*." 41 U.S.C. § 3307(d)(1) (emphasis added). FAR part 10, in turn, provides that the description of the agency's needs must be "stated in terms sufficient to allow conduct of market research." FAR 10.002(a). The latter further provides that "[t]he extent of market research will vary, depending on such factors as . . . complexity[] and past experience." FAR 10.002(b)(1). Here, GSA conducted appropriate market research considering that its need was an IDIQ contract vehicle for the acquisition of various categories of services. Also, GSA reasonably relied on its past experience under the existing contract vehicles being consolidated into the OASIS+ IDIQ contract vehicle to determine that a non-commercial contract vehicle was necessary.

BCG further argues that "[d]espite the entirety of GSA's market research since 2021 hinging on a 'No IDIQ pricing' strategy, the Agency did not conduct any additional market research following the *SH Synergy* decision," [ECF 13] at 36, and "[i]nstead, GSA opted to require other than cost or pricing data from every offeror because it required the least effort from the Agency," *id*. Yet, BCG does not identify any requirement in FASA or FAR part 10 that an agency revisit its market research due to a change in its price evaluation strategy. Furthermore, aside from a reference to "customary practices" under which commercial sales are made in FAR 10.002(b)(1)(iii), nothing in FASA or FAR part 10 requires that an agency consider price or price evaluation strategy as part of market research. Even if it did, however, GSA conducted a historical analysis of other MACs and GWACs upon notice of the *SH Synergy* decision. AR 845-46 (identifying the price evaluation strategy for multiple IDIQ contracts). Based on that analysis, GSA "considered a number of alternatives to evaluate price[,]" AR 845, and it selected the price evaluation strategy after weighing the pros and cons of those alternatives, *see* AR 847-61. Based on GSA's historical analysis and its evaluation of price strategies, the Court will not second-guess GSA's reasoned approach to price evaluation, when it is apparent and supported by the record.[17] *See Savantage Fin. Servs.*, 595 F.3d at 1287.

---

[17] BCG also argues that GSA failed to consider other alternatives to the price evaluation strategy it ultimately chose. *See* [ECF 13] at 31-32 (arguing that "GSA failed to consider [] alternatives."). This argument fails, however, because GSA is only required "to proffer an explanation for its *action* [and] that explanation need not be extensive." *Bannum, Inc. v. United States*, 91 Fed. Cl. 160, 172 (2009) (emphasis added) (citing *Camps v. Pitts*, 411 U.S. 138, 142-43 (1973)). The Court need only "ensure that the agency examined the relevant data and articulated a 'rational connection between the facts found and the choice made.'" *Id.* (internal quotation marks omitted) (citing *State Farm*, 463 U.S. at 43). Here, GSA's decision to proceed with its price evaluation strategy is rational.

Lastly, BCG also argues that "commercial contractors are effectively precluded from competing in the OASIS+ procurement" because "commercial items contractors that do not perform cost-based work or maintain cost-based accounting systems in the ordinary course of business will not be able to provide substantiation for their indirect rate breakdown." [ECF 13] at 28-29. BCG asserts that "GSA makes clear that offerors that cannot provide substantiated indirect rates, such as BCG and all other commercial items contractors, will be deemed to present performance and responsibility risks to the Government, lacking supporting information to make a fair and reasonable price determination, and representing financial controls and accounting risks." *Id*. at 29. Therefore, according to BCG, "it is clear that commercial items contractors that do not maintain cost-based accounting systems are effectively precluded from this procurement by either inability to propose, compliance risk arising from participating or are, at a minimum, compelled to accept price submission terms that are inconsistent with customary commercial practice." *Id*. at 29-30. This argument is unpersuasive for two reasons. First, BCG is not precluded from competing in the OASIS+ program because of the Solicitation's requirement that offerors submit indirect cost data. The Solicitation requires that all offerors "propose indirect rate percentages generated from their accounting system, and submit a copy of the indirect rates generated by the Offeror's accounting system." AR 2516. The Basis of Estimate for the labor rates, including indirect cost rates, must be "consistent with the[] organization's accounting system[.]" AR 2518. In the absence of approved indirect rates, the Solicitation allows offerors to "state the methodology used in computing their organization's indirect cost rates (e.g., Fringe Benefits, Overhead, G&A, Facilities Capital Cost of Money, etc.) . . . and explain how the indirect costs were derived." AR 2519. There is no requirement for an approved accounting system or a particular methodology, only that there be sufficient information to demonstrate that the offeror has adequate accounting controls and that its pricing is fair and reasonable. *See* AR 2742-43. These requirements do not preclude BCG from competing under the Solicitation. *See Palantir*, 129 Fed. Cl. at 285 (finding that the protestor "lost the opportunity to offer the Army commercial items because of the developmental approach the Army took . . . *to the exclusion* of consideration of commercial items") (emphasis added). Next, as explained in detail below, even in an acquisition for commercial services, GSA has discretion under FAR subpart 15.4 to request indirect cost data as necessary to determine fair and reasonable pricing.

**B.      GSA Did Not Violate FAR Subpart 15.4 By Requiring Offerors to Submit Indirect Cost Data**

In addition to challenging GSA's market research and commerciality determination, BCG argues that, despite planning for years to have acquisitions under OASIS+ evaluated for price at the task order level only, GSA violated FAR subpart 15.4 by suddenly requiring offerors to submit other than cost and pricing data in the form of indirect cost breakdowns. [ECF 13] at 37-38. According to BCG, GSA's new approach to pricing conflicts with its acquisition plan, which states that the CO will evaluate fair and reasonable pricing using the techniques identified in FAR 15.404-1(b). *Id.* at 38. BCG also questions GSA's conclusion that requiring such data will not provide them with more information than is needed, as well as its conclusion that this method is the only way to assess whether the BCG's price proposal is fair and reasonable. *Id.* In BCG's view, while the FAR does afford agencies discretion in evaluating price proposals, COs are precluded "from evaluating other than certified cost or pricing data unless there are no other

techniques, or combination of techniques, to determine a fair and reasonable price." *Id.* at 39. The Court finds that GSA acted within its discretion under FAR subpart 15.4 by requesting indirect cost breakdowns from all Solicitation offerors.

        *1.     Overview of FAR Subpart 15.4*

FAR subpart 15.4 "prescribes the cost and price negotiation policies and procedures for pricing negotiated prime contracts[.]" FAR 15.400. FAR 15.402 sets forth pricing policy when contracting by negotiation. It requires that the CO "[p]urchase supplies and services from responsible sources at fair and reasonable prices." FAR 15.402(a). It also instructs the CO on what types of data to obtain in establishing the reasonableness of the offered prices. *Id.* Relevant here, it provides that the CO:

> (2) When certified cost or pricing data are not required by 15.403–4, shall obtain data other than certified cost or pricing data as necessary to establish a fair and reasonable price, generally using the following order of preference in determining the type of data required:
>
>> (i) No additional data from the offeror, if the price is based on adequate price competition, except as provided by 15.403–3(b).
>>
>> (ii) Data other than certified cost or pricing data such as—
>>
>>> (A) Data related to prices (*e.g.*, established catalog or market prices, sales to non-governmental and governmental entities), relying first on data available within the Government; second, on data obtained from sources other than the offeror; and, if necessary, on data obtained from the offeror. When obtaining data from the offeror is necessary, unless an exception under 15.403–1(b)(1) or (2) applies, such data submitted by the offeror shall include, at a minimum, appropriate data on the prices at which the same or similar items have been sold previously, adequate for evaluating the reasonableness of the price.
>>>
>>> (B) Cost data to the extent necessary for the contracting officer to determine a fair and reasonable price.

FAR 15.402(a)(2)(i)-(ii).[18]

---

[18] "Data other than certified cost or pricing data" is defined in FAR 2.101 as "pricing data, cost data, and judgmental information necessary for the [CO] to determine a fair and reasonable price or to determine cost realism."

FAR 15.403-3 applies to acquisitions that do not require certified cost or pricing data, and its requirements align with the pricing policy in FAR 15.402. It states that the CO shall:

> (i) Obtain whatever data are available from Government or other secondary sources and use that data in determining a fair and reasonable price;
>
> (ii) Require submission of data other than certified cost or pricing data, as defined in 2.101, from the offeror to the extent necessary to determine a fair and reasonable price (10 U.S.C. 3705(a) and 41 U.S.C. 3505(a)) if the [CO] determines that adequate data from sources other than the offeror are not available. This includes requiring data from an offeror to support a cost realism analysis;
>
> (iii) Consider whether cost data are necessary to determine a fair and reasonable price when there is not adequate price competition;
>
> (iv) Require that the data submitted by the offeror include, at a minimum, appropriate data on the prices at which the same item or similar items have previously been sold, adequate for determining the reasonableness of the price unless an exception under 15.403–1(b)(1) or (2) applies; and
>
> (v) Consider the guidance in section 3.3, chapter 3, volume I, of the Contract Pricing Reference Guide cited at 15.404–1(a)(7) to determine the data an offeror shall be required to submit.

FAR 15.403-3(a)(1)(i)-(v). In consideration of the policy in FAR 15.402, FAR 15.403-5 states that the CO "shall specify in the solicitation . . . [a]ny requirement for data other than certified cost or pricing data." FAR 15.403-5(a)(3). The CO may also specify the format for submission of such data if he determines "that use of a specific format is essential for evaluating and determining that the price is fair and reasonable[.]" FAR 15.403-5(b)(2).

FAR 15.404-1 sets forth proposal analysis techniques and procedures to be used by the CO to "ensure that the final agreed-to price is fair and reasonable." FAR 15.404-1(a). It provides that "[p]rice analysis shall be used when certified cost or pricing data are not required[.]" FAR 15.404-1(a)(2). It further states:

> Price analysis is the process of examining and evaluating a proposed price without evaluating its separate cost elements and proposed profit. Unless an exception from the requirement to obtain certified cost or pricing data applies under 15.403–1(b)(1) or (b)(2), at a minimum, the [CO] shall obtain appropriate data, without certification, on the prices at which the same or similar items have previously been sold and determine if the data is adequate for

17

> evaluating the reasonableness of the price. Price analysis may include evaluating data other than certified cost or pricing data obtained from the offeror or contractor when there is no other means for determining a fair and reasonable price. [COs] shall obtain data other than certified cost or pricing data from the offeror or contractor for all acquisitions (including commercial acquisitions), if that is the [CO's] only means to determine the price to be fair and reasonable.

FAR 15.404-1(b)(1). FAR 15.404-1(b)(2) provides a non-exhaustive list of price analysis techniques and procedures. FAR 15.404-1(b)(2)(i)-(vii). FAR 15.404-1(b)(3) provides a preference for using adequate competition to establish a fair and reasonable price or comparing proposed prices to historical prices paid for the same or similar items, but it also allows the CO the discretion to use other techniques, including the analysis of data other than certified cost or pricing data provided by the offeror, if the CO determines that "information on competitive proposed prices or previous contract prices is not available or is insufficient to determine that the price is fair and reasonable." FAR 15.404-1(b)(3).

##### 2.    Analysis

The overarching policy objective of FAR subpart 15.4 is for the CO to "[p]urchase supplies and services from responsible sources at fair and reasonable prices."[19] FAR 15.402(a). In furtherance of this objective, the FAR identifies the types of data that COs shall obtain to establish "the reasonableness of the *offered* prices," FAR 15.402(a) (emphasis added), and the "analytical techniques and procedures . . . [for] examining and evaluating a *proposed* price," FAR 15.404-1 (emphasis added), "to ensure that the final agreed-to price is fair and reasonable," FAR 15.404-1(a). FAR 15.404-1(a)(2) provides that "[p]rice analysis shall be used when certified cost or pricing data are not required,"[20] such as in the OASIS+ Solicitation. Under this framework, it seems logical to suppose that the government would first request prices from offerors for the needed supplies and services and then proceed with establishing the fairness and reasonableness of such prices by determining what types of data are necessary and what price analysis techniques are appropriate for achieving this objective. However, in this instance, the GSA determined—in advance of soliciting and receiving prices for the various labor categories—that it needed other than certified cost or pricing data in the form of indirect cost data to evaluate price. There is nothing in FAR subpart 15.4 that precludes the GSA from deciding what type of data is needed in advance of soliciting and receiving proposed prices from the offerors. To the contrary, because FAR subpart 15.403-5 instructs that the contracting officer "shall specify *in the solicitation* . . . [a]ny requirement for data other than certified cost or pricing data," FAR 15.403-5(a)(3) (emphasis added), the FAR mandates the approach taken by the GSA in this regard.

It is also clear from the text of FAR subpart 15.4 that it is within the CO's discretion to determine the type of data necessary to establish fair and reasonable pricing in the context of an

---

[19] "Price" is defined as "cost plus any fee or profit applicable to the contract type." FAR 15.401.

[20] "Price analysis" is defined as "the process of examining and evaluating a proposed price without evaluating its separate cost elements and proposed profit." FAR 15.404-1(b)(1).

individual procurement, to include requesting cost data if that is what is needed to determine whether a proposed price is fair and reasonable. *See DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1310-11 (Fed. Cir. 2021) (stating that the choice of a price analysis technique to establish a fair and reasonable price "sits comfortably amid" the CO's discretion). To that end, multiple subsections allow the CO to obtain "data other than certified cost or pricing data" as necessary to assess the fairness and reasonableness of the proposed pricing.[21] *See, e.g.*, FAR 15.402(a)(2) (requiring that the CO "shall obtain data other than certified cost or pricing data *as necessary* to establish a fair and reasonable price") (emphasis added); FAR 15.403-3(a)(1)(ii) (requiring "submission of data other than certified cost or pricing data . . . from the offeror *to the extent necessary* to determine a fair and reasonable price") (emphasis added); FAR 15.404-1(b)(1) (requiring that the CO "shall obtain data other than certified cost or pricing data from the offeror or contractor for all acquisitions (including commercial acquisitions), *if that is the [CO's] only means to determine the price to be fair and reasonable*") (emphasis added). Additionally, multiple subsections are consistent in allowing for the consideration and use of "cost data" as necessary for the CO to determine fair and reasonable pricing. *See, e.g.*, FAR 15.402(a)(2)(ii)(B) (allowing the CO to obtain "[c]ost data to the extent necessary for the [CO] to determine a fair and reasonable price"); FAR 15.403-3(a)(1)(iii) (instructing the CO to "[c]onsider whether cost data are necessary to determine a fair and reasonable price when there is not adequate price competition"); FAR 15.404-1(b)(2)(vii) (allowing "[a]nalysis of data other than certified cost or pricing data (as defined at 2.101) provided by the offeror"). Of course, the CO's determination must be rational, but FAR subpart 15.4 is not prohibitive and is instead measured by "the reasonable-discretion-informed appropriateness" of the determination under the circumstances, *Dyncorp*, 10 F.4th at 1312.

Nevertheless, the CO's discretion under FAR subpart 15.4 is not entirely unbridled. First, if there is adequate price competition, no additional data should be collected from the offerors. *See, e.g.*, FAR 15.402(a)(2)(i) (stating that the CO shall obtain "[n]o additional data from the offeror, if the price is based on adequate price competition"); FAR 15.403-3(a)(1)(iii) (allowing consideration of cost data "when there is not adequate price competition"); FAR 15.404-1(b)(2)(i) (stating a preference for comparison of proposed prices because "[n]ormally, adequate price competition establishes a fair and reasonable price"). Next, if the CO determines that "other than certified cost or pricing data" is needed to establish price reasonableness, there is a preference to rely, first, on data available within the government, then on data obtained from sources other than the offeror, and last (if necessary) on data obtained from the offeror. *See* FAR 15.402(a)(2)(ii)(A); *see also* FAR 15.403-3(a)(1)(i) (instructing the CO to "[o]btain whatever data are available from Government or other secondary sources and use that data in determining a fair and reasonable price"); FAR 15.403-3(a)(1)(ii) (instructing the CO to "[r]equire submission of data other than certified cost or pricing data . . . from the offeror to the extent necessary to determine a fair and reasonable price . . . if the [CO] determines that adequate data from sources other than the offeror are not available"); FAR 5.404-1(b)(1) (stating that "[p]rice analysis may include evaluating data other than certified cost or pricing data *obtained from* the offeror or contractor when there is no other means for determining a fair and reasonable price") (emphasis added). Lastly, the CO is to "[o]btain the type and quantity of data necessary to establish a fair

---

[21] "Data other than certified cost or pricing data" is broadly defined as "pricing data, cost data, and judgmental information necessary for the [CO] to determine a fair and reasonable price or to determine cost realism." FAR 2.101.

and reasonable price, but not more data than is necessary." FAR 15.402(a)(3); *see also* FAR 15.403-3(a)(1)(ii) (requiring "submission of data other than certified cost or pricing data . . . from the offeror to the extent necessary to determine a fair and reasonable price"); 10 U.S.C. § 3705(a) (stating that "[w]hen certified cost or pricing data are not required . . . , the offeror shall be required to submit to the [CO] data other than certified cost or pricing data (if requested by the [CO]), to the extent necessary to determine the reasonableness of the price").

Here, GSA acted within its discretion under FAR subpart 15.4 when it determined that indirect cost data was necessary to determine price reasonableness. In deciding on its pricing strategy, GSA considered several features of the OASIS+ program, including the scope of the services covered by the contract vehicle, the number of offerors, and the applicable labor categories. AR 847. Based on these factors, GSA considered the pros and cons of requesting indirect rate breakdowns from offerors with respect to a limited number of general labor categories and determined that it was the preferred approach for assessing price reasonableness. *See* AR 849 (stating that "[t]he information provided . . . will be more meaningful to the Government than requesting fully burdened labor rates of a larger number of labor categories— the latter of which would still not cover the extent of the scope on OASIS+ without being unreasonably cumbersome on industry and Government"); AR 851 ("Recommended Approach: Option 1 - Request Indirect Rates with Price Proposal"). Additionally, the GSA concluded that adequate price competition did not exist, so data other than certified cost or pricing data was needed. *See* AR 2649-50 (stating that "the cost / pricing support requirements need to also be compared to the solicitation requirements, and the offer will provide information to support the individual elements, and ultimately the fully burdened rates, to support the COs fair and reasonable determination"); AR 2650 (stating that "while the OASIS+ solicitations are considered 'competitive procurements,' one offeror cannot displace another offeror. Generally speaking, when a best value or award based on price only is contemplated there is a firm scope; offerors and pricing in particular (as well as technical submissions) are compared to one another. This is not the case in the OASIS+ solicitation methodology"). Having determined that indirect cost data was necessary to establish fair and reasonable pricing, GSA specified in the Solicitation that indirect cost data was required and set forth the format in which such data should be submitted. AR 2516-17; *see also* FAR 15.403-5(a)(3); FAR 15.403-5(b)(2).

The rationale behind GSA's approach to assessing price reasonableness is further detailed in its "White Paper to Discuss Requesting Indirect Rate Information on OASIS+ to Support Price Fair and Reasonable Determinations in Response to Concerns Received from Industry." *See* AR 2646-68. GSA summarizes its position as follows:

> In summary, the Government is requesting information required to achieve meaningful price analysis through the review of separate cost elements for each offeror. This approach is in the best interest of the Government because it provides the necessary insight into offerors' pricing formulations and price drivers for each offeror. The OASIS+ labor categories apply to all Domains on the six solicitations; and therefore, represent a broad-based scope.

AR 2646. GSA then explains why, in its view, this approach is advantageous. First, GSA describes "unbalanced proposed pricing," one of the problems that could result from GSA's lacking complete cost build-up data:

> Failure to fully review the cost build-up data from offerors could lead to offerors skewing their pricing and pricing their most used labor categories higher than their least used leading to unbalanced proposed pricing. Requiring the indirect rates will help mitigate the risk of this happening, in that at least both offerors' direct labor and indirect rates will be disclosed, and the CO will know how their pricing is derived and can identify issues with their pricing, based on a review of the individual elements of price (i.e., direct labor rates/costs, indirect rates/costs, and proposed profit).

*Id.* Next, GSA describes other related problems that could be caused by offerors failing to submit complete cost build-up data:

> One contractor may define and have different requirements for the same labor category; therefore, to use other comparative means to determine the pricing fair and reasonable would present a high risk of unbalanced pricing, false-positive fair and reasonable determinations, and disparate pricing across offeror price proposals.

*Id.* Then, GSA provides an in-depth explanation of its understanding of the applicable regulations. AR 2648-52. Significantly, this explanation includes "Discussion Points" detailing the OASIS+ program COs' assessment of each of § 15.404-1(b)(2)'s example price analysis techniques and explaining why each technique is inadequate for determining price reasonableness. AR 2649-52. Thereafter, GSA reviews potential protest grounds gleaned from industry feedback. AR 2652-61. Under the first potential protest ground, "Indirect rate information is only applicable to cost-type contracts," GSA reiterates its rationale for requiring "other than certified cost or pricing data" from all offerors. AR 2652-53. First, it states that "[s]ince there are no defined specific project scope elements at the master contract level, the responding offerors' pricing cannot reasonably be compared to each other, because there is no firm common ground from one labor category to the other." AR 2652. Next, it explains that published, catalog, or Independent Government Estimate pricing would not be sufficient since "the offerors will be from all over the nation and have differing cost drivers and no commonality in their pricing due to the lack of specific project/scope boundaries." *Id.* Based on the information in the white paper, "the OASIS+ CO team determined that requiring indirect costs is the only method to determine the OASIS+ offeror pricing fair and reasonable." AR 2648; *see also* AR 2661 ("The OASIS+ [COs] determined that requesting the indirect cost build up/indirect rates from the offerors is the only method available to prove the OASIS+ prices fair and reasonable."). Because the record reflects a rational basis for the GSA to request indirect cost data, the Court will not interfere with its discretionary determination. *See Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1376 (Fed. Cir. 2009) (reversing trial court on grounds that agency's determination was within its discretion and trial court impermissibly substituted its judgment for that of the agency).

BCG contends that "GSA did not comply with the 'minimum' requirement that the [CO] 'shall' obtain data 'on the prices at which the same or similar items have previously been sold' and, consequently, did not 'determine if the data is adequate for evaluating the reasonableness of the price.'" [ECF 13] at 40. The "minimum requirement" referenced by BCG is found in several sections of FAR subpart 15.4 with slightly different wording. *See, e.g.,* FAR 15.402(a)(2)(ii)(A); FAR 15.403-3(a)(1)(iv); FAR 15.404-1(b)(1). The version on which BCG focuses is found in FAR 15.404-1(b)(1), which governs price analysis. It states that, "at a minimum, the contracting officer shall obtain appropriate data, without certification, on the prices at which the same or similar items have previously been sold and determine if the data is adequate for evaluating the reasonableness of the price." BCG's argument is unavailing for the following reasons.

First, this requirement instructs the contracting officer to, *at a minimum*, obtain historical price data for the same or similar items. It does not state that this is a mandatory, first step in a price analysis that precludes the CO from making the discretionary determination that a more burdensome data request is necessary for establishing price reasonableness. Furthermore, in *DynCorp*, the Federal Circuit held that the CO has the discretion to select any of the price analysis techniques listed in FAR subpart 15.404-1(b)(2) and that the preferred techniques identified in FAR subpart 15.404-1(b)(3) do not restrict that discretion. 10 F.4th at 1310, 1312. If this minimum requirement in FAR 15.404-1(b)(1) were viewed as limiting in nature, it would contravene the discretion afforded the CO under FAR 15.404-1 and improperly "cabin a [CO's] discretion" to select a price analysis technique. *Id.* at 1312. This is clear from the fact that one of the preferred techniques in FAR 15.404-1(b)(3)—comparing the proposed prices to historical prices paid for the same or similar items—is essentially the same as the minimum requirement in FAR 15.404-1(b)(1)—obtaining appropriate data on the prices at which the same or similar items have been previously sold.

Next, GSA implicitly complied with this requirement when "[t]he OASIS+ [COs] determined that requesting the indirect cost build up/indirect rates from the offerors is the *only method* available to prove the OASIS+ prices fair and reasonable." AR 2661 (emphasis added). In making this determination, GSA necessarily also found that using historic price data for the same or similar items was not adequate for evaluating price reasonableness. *See DynCorp*, 10 F.4th at 1312 (explaining that "[i]n exercising her fact-specific judgment to select a price-analysis technique, a contracting officer will reasonably view some to be suitable and some not—in a manner that may be implicit"). Although the record does not demonstrate that GSA affirmatively addressed this requirement, it was not required to document every step in its decision-making process under FAR subpart 15.4. *See id.* at 1313 (stating that FAR 15.404-1(b) lacks a documentation requirement and that COs are not obligated by the APA to provide written explanations for their actions). The Court will uphold a decision of less-than-ideal clarity where the agency's path may reasonably be discerned. *Bowman*, 419 U.S. at 286.

Finally, the record shows that GSA considered using price data from the prior OASIS contract and determined that this data was not adequate for evaluating price reasonableness. AR 2650. The requirement under FAR 15.404-1(b)(1) that the CO obtain data "on the prices at which the same or similar items have previously been sold" to determine if it is adequate for evaluating price reasonableness is essentially the same as the price analysis technique in FAR 15.404-

1(b)(2)(ii), which involves a "[c]omparison of the proposed prices to historical prices paid, whether by the Government or other than the Government, for the same or similar items." In its utilization of the price analysis technique described in FAR 15.404-1(b)(2)(ii), GSA states: "OASIS+ also considered comparing the offered pricing to the prior OASIS awarded labor category rates, but also determined that this was not a business decision that would be in the Government's best interest." AR 2650. GSA further explained: "To compare the OASIS+ labor categories, which are also not the same labor categories as those awarded on the original OASIS, would not allow a CO to determine that pricing is fair and reasonable." *Id.* Thus, while GSA did not take these actions in direct response to FAR 15.404(b)(1)'s "minimum" requirement, the record shows that GSA considered available price data at which the same or similar items were previously sold and determined that such data was not adequate for evaluating price reasonableness.[22]

## IV.    CONCLUSION

For the reasons set forth above, the government's combined motion to dismiss and MJAR [ECF 19] is **GRANTED-IN-PART** and **DENIED-IN-PART**. Its motion to dismiss is **DENIED**, and its MJAR is **GRANTED**. BCG's MJAR [ECF 13] is **DENIED**. The Clerk is **DIRECTED** to enter judgment accordingly.

Some information contained in this Opinion and Order may be considered protected information subject to the Protective Order entered on December 19, 2023, [ECF 9]. Accordingly, the Opinion and Order is filed **UNDER SEAL**. The parties **SHALL CONFER AND FILE**, on or before August 26, 2024, a joint status report that (i) identifies the information, if any, that the parties contend should be redacted, (ii) explains the basis for each proposed redaction, and (iii) includes an attachment of the proposed redactions for this Opinion and Order.

**IT IS SO ORDERED.**

s/ Thompson M. Dietz
THOMPSON M. DIETZ, Judge

---

[22] To prevail in a bid protest, the protester must show not only an error in the procurement process but also that the error prejudiced the protestor. *See Bannum*, 404 F.3d at 1351. Because BCG has not succeeded in showing that GSA's procurement process was arbitrary, capricious, an abuse of discretion, or contrary to law, the Court does not reach the prejudice requirement.